IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THOMAS J. CUSSEN, On Behalf of Himself and All Others Similarly Situated, | § § § § | Civil Action No. |
| Plaintiff, | § § § | |
| vs. | § § § | |
| MBNA CORP., BRUCE L. HAMMONDS, KENNETH A. VECCHIONE, RICHARD K. STRUTHERS, CHARLES C. KRULAK, JOHN R. COCHRAN, III, MICHAEL G. RHODES, LANCE L. WEAVER and JOHN W. SCHEFLEN, | § § § § § § § | **JURY TRIAL DEMANDED** |
| Defendants. | | |

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF FEDERAL SECURITIES LAWS**

Plaintiff individually and on behalf of all other persons similarly situated, by his

undersigned attorneys, for his complaint against defendants, alleges the following based

upon personal knowledge as to himself and his own acts, and upon information and belief

as to all other matters, based on, inter alia, the investigation conducted by and through his

attorneys, which included, amongst other things, a review of the defendants' press

releases, Securities and Exchange Commission ("SEC") filings by MBNA Corp.

("MBNA" or the "Company") and media reports about the Company. Plaintiff believes

that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.     This is a securities class action on behalf of plaintiff and all other persons or entities, except for defendants, who purchased or otherwise acquired MBNA securities ("the "Class") during the period October 16, 2003 and April 21, 2005, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5.

3.     Venue is proper in this District pursuant to §27 of the 1934 Act.  The corporate headquarters of MBNA are located in the District.

4.     In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of the national securities exchanges.

## PARTIES

5.     Plaintiff, Thomas J. Cussen, as set forth in the accompanying certification, incorporated by reference herein, purchased publicly traded shares of MBNA stock at artificially inflated prices during the Class Period as described in the attached certification and was damaged thereby.

6.     Defendant MBNA is a bank holding company and the parent of MBNA

America Bank, N.A., a national bank. MBNA America has two principal subsidiaries: MBNA Europe Bank Limited and MBNA Canada Bank, fully chartered banks that issue credit cards in the United Kingdom, Ireland, Spain, and Canada. The Company is headquartered at 1100 North King Street, Wilmington, Delaware and has over 1.277 billion shares of common stock issued and outstanding which trade on the NYSE under the ticker symbol "KRB."

7.      Defendant Bruce L. Hammonds ("Hammonds") is Chief Executive Officer ("CEO"), President and a director of MBNA. Prior to assuming these positions on December 30, 2003, Hammonds served as Chairman and CEO, and prior thereto as Chief Operating Officer of MBNA. Hammonds has been a director of MBNA since 1986. Hammonds has 35 years of management experience in consumer lending and was a member of the management team that established MBNA in 1982. During the Class Period, Hammonds sold more than $9 million worth of his MBNA stock.

8.      Defendant Kenneth A. Vecchione ("Vecchione") was Vice Chairman and Chief Financial Officer ("CFO") of MBNA and CFO of MBNA America Bank. Vecchione has been a director of MBNA America since January 2005 and also serves as CFO of MBNA Delaware. Vecchione is responsible for accounting, corporate and strategic planning, treasury and financial operations, business analysis (including M&A analysis), financial planning, and investor relations. Vecchione spoke at the February 9, 2005 CSFB investor conference. During the Class Period, Vecchione sold more than $2.6 million worth of his MBNA stock.

9.      Defendant Richard K. Struthers ("Struthers") was Vice Chairman of MBNA and MBNA America. Struthers is also a director and serves as Chief Loan

Officer of MBNA America, as well as Chairman of MBNA Europe and MBNA Canada. In addition, Struthers is a director and serves as Chairman and Chief Executive Officer of MBNA Delaware. Struthers is responsible for international operations, consumer finance, business lending, and MBNA America's American Express credit card program. Struthers has 27 years of experience in consumer lending and was a member of the management team that established MBNA America in 1982. During the Class Period, Struthers sold more than $12 million worth of his MBNA stock.

10.     Defendant Charles C. Krulak ("Krulak") was Vice Chairman of MBNA and MBNA America. Krulak was responsible for corporate development and acquisitions, personnel, compensation and benefits, and education and career development. Krulak previously served as CEO of MBNA Europe. During the Class Period, Krulak sold more than $13 million worth of his MBNA stock.

11.     Defendant John R. Cochran, III ("Cochran") was the Chief Operating Officer of MBNA and is the Chairman, Chief Executive Officer and President of MBNA America. Cochran previously served as the Chief Operating Officer and Chief Marketing Officer of MBNA America. Cochran has 32 years of management experience in the financial services industry and was a member of the management team that established MBNA America in 1982. Cochran has been a director of MBNA America since 1986. During the Class Period, Cochran sold more than $14 million worth of his MBNA stock.

12.     Defendant Michael G. Rhodes ("Rhodes") was Group Executive for the U.S. Credit Card Business Development division of MBNA. Rhodes spoke at the February 9, 2005 CSFB investor conference. During the Class Period, Rhodes sold more than $10.8 million worth of his MBNA stock.

4

13.    Defendant Lance L. Weaver ("Weaver") was Vice Chairman of MBNA and MBNA America. Weaver is also a director of MBNA America. Weaver is responsible for MBNA America's U.S. credit card business, including business development, marketing, sales, customer satisfaction, U.S. regional operations, credit, customer assistance and fraud. Weaver also serves as a board member and former chairman of MasterCard International Inc. Weaver has 30 years of experience in consumer lending and administration and has been with the Company for 14 years. Weaver has been a director of MBNA America since 1993. During the Class Period, Weaver sold more than $10 million worth of his MBNA stock.

14.    Defendant John W. Scheflen ("Scheflen") was Vice Chairman of MBNA America. Scheflen also serves as Secretary of MBNA and MBNA America. Scheflen is responsible for corporate governance, compliance, information security, operational risk management, and portfolio risk management. During the Class Period, Scheflen sold more than $3.3 million worth of his MBNA stock.

15.    The individuals named as defendants in ¶¶8-15 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of MBNA's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of

these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein at ¶¶51-88, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SCIENTER

16.    In addition to the above-described involvement, each Individual Defendant had knowledge of MBNA's problems and was motivated to conceal such problems. Vecchione, as CFO, was responsible for financial reporting and communications with the market. Many of the internal reports showing MBNA's forecasted and actual growth were prepared by the finance department under Vecchione's direction. Defendant Hammonds, as CEO and Chairman, and the other officer defendants named herein were responsible for the financial results and press releases issued by the Company. Each Individual Defendant sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market.

17.    Defendants were motivated to engage in the fraudulent practices alleged herein in order to sell over $75 million worth of their personally held MBNA stock to make up for their decreased salaries and bonuses and to justify the receipt of millions of dollars in bonuses in January 2005.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

18.    Each defendant is liable for (i) making false statements, or (ii) failing to disclose adverse facts known to him about MBNA. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of MBNA publicly traded securities was a success, as it (i) deceived the investing public regarding MBNA's

6

prospects and business; (ii) artificially inflated the price of MBNA's publicly traded securities; (iii) allowed defendants to obtain larger bonuses which were directly tied to the Company's falsified performance; (iv) allowed defendants to arrange to sell and actually sell in excess of $75 million worth of MBNA shares at artificially inflated prices; and (v) caused plaintiff and other members of the Class to purchase MBNA publicly traded securities at inflated prices.

19.    Each defendant is liable for (a) making false statements, *or* (b) failing to disclose adverse facts known to him about MBNA. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of MBNA publicly traded securities was a success, as it (a) deceived the investing public regarding MBNA's prospects and business; (b) artificially inflated the prices of MBNA's publicly traded securities; and (c) caused plaintiff and other members of the Class to purchase MBNA's publicly traded securities at inflated prices.

## **OVERVIEW OF THE CASE**

20.    MBNA is an international financial services company providing retail lending, deposit, and credit insurance products and services to its customers. In addition to being the world's largest independent credit-card company, MBNA makes other consumer loans to individuals and commercial loans primarily to small businesses. MBNA is the No. 3 U.S. credit card issuer, and the Company, which went public in 1991, had a stock market value of approximately $35 billion at the start of the Class Period.

21.    At the end of fiscal year 2003, U.S. credit card issuers understood the changing paradigm regarding consumer use and reliance on credit cards. Profits now heavily depended on "renting money" to those consumers who typically made minimum

payments on their credit card debt. Issuers seeking to access these consumers now faced fierce competition. With the average American now carrying three credit cards, the days of rapid expansion were over for the industry. Consumers could force – and rapidly were forcing – credit card companies to compete by moving credit card balances from card to card based on which company was offering the best terms. Credit card companies – forced to offer no-interest promotional rates and to increasingly extend the no-interest periods in order to lure in new customers – were seeing their profit margins dwindle.

22.    In periods of high competition among card issuers, so-called "teaser" no-interest lending is costly for credit card companies because they incur all of the transactional and capital costs of providing free financing to new borrowers during the teaser period, but many borrowers simply choose to move the balance to another lender offering a competing teaser at the end of the promotional period.

23.    The Class Period begins on October 16, 2003, whereupon defendants made false and misleading statements regarding the growth and direction of MBNA loan receivable assets. Defendants used false and deceptive means to present a healthy picture of growth for its loan receivable assets, to conceal several serious quarter over quarter declines, including a decline of 3.4% or $1 billion in loan receivables during the third quarter of 2003 and an astonishing decline of 10.4% or $3.5 billion during the first quarter of 2004. These declines align with a steep decline in defendants' structured financing activities, a decline that had an adverse impact on defendants' attempts to manage the cost of money in an increasing interest rate environment.

24.    MBNA and its executives faced another problem during the Q1 2005. Shareholder upheaval surrounded the Company's 2004 annual meeting of shareholders,

8

with large institutional investors demanding increased board independence and reductions in the extraordinary executive compensation MBNA's Board had been providing to its top executives. (MBNA's CEO had ranked number one in compensation among all U.S. executives in 2003, receiving $45.5 million.) As a result, certain Board members were replaced with ostensibly "independent" directors in 2004 and, by early January 2005, the Company's CEO's salary had been cut 34% and the salaries of its top five highest executives were cut a combined average of 37%.

25.    However, these same executives were each sitting on tens of millions of dollars worth of stock options and shares of restricted stock which had been granted to them – all of which, defendants knew, would rapidly decline in value if the truth about MBNA's market conditions, business operations and financial prospects came to light. As a result, as MBNA's competitors lowered their guidance for 2005 in light of decreasing credit card revenues and increasing advertising expenses, on January 21, 2005, the start of the Class Period, MBNA issued the first earnings forecast in the Company's history, projecting an ongoing 12% earnings increase – with a 10% increase in 2005 earnings over 2004's.

26.    Defendants said MBNA would make this target because the Company had already drastically reduced its own reliance on insidious no-interest loans, rendering its own loan portfolio more profitable than that of its competitors. Defendants also projected a 20%+ increase in Return on Equity. Defendants' EPS estimate for 2005 was $2.36 per share, which was 10% above the Company's 2004 EPS. These projections were being made nearly one-third of the way into the Q1 2005 and would be repeated and detailed at the Company's January 21, 2005 and February 9, 2005 investor conferences.

9

27.    Defendants also primed the market by announcing an increase in the Company's dividend to 17% and a $2 billion stock buyback program. Defendants promised "consistent, profitable growth" for MBNA despite the competition in the industry because MBNA would not get sucked into the teaser no-interest rate promotional game.

28.    But on April 21, 2005, defendants shocked the market by disclosing MBNA had earned only $0.02 cents in Q1 2005 – a 94% decline from the $0.59 per share it reported in Q4 2004 – and that it was guiding 2005 EPS growth down to "significantly below" its prior 10% growth estimate.

29.    The true facts which were known by each of the defendants, but concealed from the investing public during the Class Period, were as follows:

(a) As early as the third quarter of 2003, securitization of credit card receivables was in decline and the decline remained an alarming component of defendants' structured financing activities throughout the Class Period;

(b) The quarterly comparison defendants engineered to report loan receivable assets was deceptive, since it totally obscured meaningful and important trends in the direction of asset growth of over time;

(c) Loan receivables had contracted several times during the Class Period, with the most severe contraction occurring during the first quarter of 2004, when *loan receivables plummeted 10.4% or $3.5 billion versus 4Q03;*

(d) The addition of millions of new customer accounts in 2004 had not contributed to growth in loan receivables and stood in stark contrast with a contraction in loan receivables during a number of quarterly reporting periods;

(e)    That the Company had experienced "unexpectedly high payment volumes from U.S. credit card customers", reducing managed loans and causing loan receivables to decrease by billions of dollars during the Class Period;

(f) Of the pre-pays, the higher interest rate borrowers were prepaying more than the lower interest rate borrowers, resulting in the prepays having a more adverse impact on the Company's yield on managed loans;

(g) MBNA had suffered several unseasonably sharp contractions in lending during the Class Period, including a contraction during Q1 2005, causing total managed loans to decrease $5 billion by the end of Q1 2004;

(h) The Company had been aggressively recognizing gains on sales of securitized no-interest loan receivables through off-balance sheet funding structures;

(i) MBNA was experiencing higher-than-expected delinquencies during the Q1 2005, increasing to 4.17% from 4.13% at the end of Q4 2004;

(j) The Company had completely reversed its margin-protection strategy of reducing reliance on no-interest loans and was instead increasing its offering of no-interest loans, which will significantly reduce future earnings;

(k) Losses on loan receivables and managed loans had increased to 3.98% and 4.48%, respectively, up from 3.74% and 4.43% respectively in the Q4 2004;

(l) Approximately 50% of MBNA's receivables were on a variable floating rate while approximately 80% of the Company's funding is tied to LIBOR, such that the Company's cost of funds was increasing more rapidly than the interest payments it was receiving from borrowers when interest rates increased;

(m) Due to the increase in pre-pays, the interest-only securitization

strips valued on the Company's books at $1.3 billion were overstated by 16%, or $27 million ($0.10 per share); and

(n) The Company's previously announced Q1 2005 restructuring charge had doubled to $767.6 million ($0.38 per share) from the $300-$350 million announced on January 21, 2005.

30.    As a result of the defendants' false statements, MBNA's stock traded at inflated levels during the Class Period which permitted the Company's top officers and directors to sell more than $75 million worth of their own shares. During the Class Period defendants also caused the Company repurchase $250 million worth of its own stock which supported the stock's high price. Defendants also used the Company's purported stellar performance to justify the payment of millions of dollars in bonuses to them in January 2005.

31.    Following the Company's shocking April 21, 2005 disclosures concerning its business operations, financial results and reduced 2005 earnings expectations, the Company's stock price plummeted from its closing price of $23.11 on the close of April 20, 2005 to below $19 per share on extremely high trading volume of 51 million shares, or 793% of its 52-week average daily trading volume. MBNA's market capitalization lost over $5.8 billion in one trading session and its credibility with the investment community has been profoundly damaged.

## BACKGROUND AND DEFENDANTS' PRE-CLASS STATEMENTS

### "Revolvers" and Securitization Concepts

32.    The indispensable feature of today's retail credit card lending equation is the "revolver" – those consumers making minimum payments on their credit card debt. This equation recognizes the predictability and risks of "renting money" to revolvers,

reducing those parameters into a risk-adjusted spread to treasury notes or other indices. This in turn allows credit card issuers to securitize their receivables, as debt "swaps", commonly referred to as credit card securitization notes or bonds.

33.    Large credit card issuers, including MBNA, routinely use "master trusts" to issue "tranches" of securitized notes ("bonds"), using the spread and a subordination scheme, with repayment coming from a single pool of credit card receivables. Bond rating agencies typically rate securitization bonds in accordance with subordination risks. Since securitization creates a "revolving" debt structure, the overall result is a variable cost of money, changing as outstanding notes are repaid, new notes are issued and as the indices for variable rate notes change. Finally, performance, legal or seller/servicer difficulties can trigger "early amortization", causing the issuer to make early repayment of the notes. For example, a declining credit card receivables pool resulting from increased competition can trigger early amortization and note repayments.

34.    Securitization bond issuance generates income for MBNA in the form of an interest-only ("IO") strip receivable. When MBNA securitizes its loan principal receivables, it recognizes a gain on sale and retained beneficial interests, including the IO strip receivable. The IO strip receivable represents MBNA's contractual right to receive interest and other revenue, less certain costs from the trust, over the estimated life of the securitized loan principal receivables. (See defendants' SEC Form 10Q filed on August 9, 2004)

35.    MBNA securitization bond offerings are made once credit card receivables are generated and are not tied to any particular schedule or quarterly event. For this reason, securitization is a "lagging" indicator of growth in defendants'

receivables. Trend analysis, looking at the rate of "growth" in the dollar amount of securitization bonds issued by MNBA versus time should provide insight into its success and prospects as a credit card issuer, including, amongst other factors, customer retention and market penetration. Assuming the predictability of positive cash flows from "renting money" to "revolvers", MBNA marketing and lending practices over time could also influence the level of securitization activity. The following multiyear plot of the issuance of MBNA securitization notes provides insight into historical performance and future prospects of the MBNA credit card business:

36.    The securitization graph shows MBNA note issuance in semiannual increments. Although volatility seems to be a feature of this measure, trends are clearly evident. For example, when compared with securitizations during the first six months of 1998, securitizations during the first six months of 2000 grew almost $4 billion or nearly 200%. That trend parallels the historical growth of MBNA's credit card business, specifically the expansion of MBNA's credit card receivables pool. While securitizations declined again during the first six months of 2001, securitizations returned again to previous levels and remained high through the first half of 2003.



37.    However, MBNA securitization note issuance during the second half 2003 dropped $1 billion or 20%, in comparison with the first half of 2003. This drop signaled the start of an alarming trend, – and by the second half of 2004, securitizations had fallen 60%, for a staggering $3 billion, when compared to the first half of 2003. This steep in securitized note issuance dropped to a level not seen since the first half of 1998.

38.    Securitization notes are repaid out of a pool generated from credit card receivables, including monthly credit card principal and interest payments. Hence, just as the increase in note issuance between 1998 and 2000 paralleled MBNA's historical growth, *the staggering 60% drop between 2003 and 2005 signaled a historical decline in the profitability of MBNA credit card business, presumably the result of a contraction in the rate of growth or size of the credit card receivables pool.*

**Aggressive Consumer Practices**

39.    The decline in credit card note securitizations beginning in the second half of 2003 presented MBNA with prospects for *an increased cost of money.* When faced with the prospect of a contraction in the credit card receivables pool, MBNA's cost of money increases, as it is forced to repay securitization notes in the order dictated by subordination, beginning with less expensive, longer-term notes first.

40.    As a middleman in a complex securitization scheme, MBNA obviously can attempt to pass these increased costs on to customers, in the form of increased credit card interest rates and fees. These attempts occurred, with MBNA pressing diamatic hikes in interest rates and monthly payments, in 2003 and continuing into the Class Period. However, since credit card lending is also highly and increasingly competitive, with customers free to move their balances elsewhere, *these tactics delayed and concealed the potential negative impacts of MBNA's increased cost of money, since they serve to "cannibalize" the customer base and contract the credit card trust receivables pool.*

**Nepotism and Compensation Concepts**

41.    Having been run by a closely knit group of officers and directors, MBNA's executives grew all too accustomed over the years to receiving absurd levels of executive compensation. During 2001 to 2003, the Company's top five most highly paid officers alone received well over $60 million in cash compensation – not counting the tens of thousands of stock options and shares of restricted stock they also received:

| Defendant/Yr. | Salary | Bonus | Total Cash Compensation |
|---|---|---|---|
| Hammonds | | | |
| 2003 | $2.5 M | $2.1 M | $4.6 M |
| 2002 | $2.4 M | $2.5 M | $4.9 M |
| 2001 | $1.8 M | $4 M | $5.8 M |
| Cochran | | | |
| 2003 | $2.5 M | $2.1 M | $4.6 M |
| 2002 | $2.4 M | $2.5 M | $4.9 M |
| 2001 | $1.8 M | $4 M | $5.8 M |
| Weaver | | | |
| 2003 | $2 M | $1.7 M | $3.7 M |
| 2002 | $1.9 M | $2 M | $3.9 M |
| 2001 | $1.5 M | $3 M | $4.5 M |
| Struthers | | | |
| 2003 | $2 M | $1.7 M | $3.7 M |
| 2002 | $1.9 M | $2 M | $3.9 M |
| 2001 | $1.5 M | $3 M | $4.5 M |
| Vecchione | | | |
| 2003 | $1.6 M | $1.4 M | $2.7 M |
| 2002 | $1.5 M | $1.6 M | $3.1 M |
| 2001 | | not disclosed | |

42.    As reported by the Philadelphia Inquirer on April 25, 2005, it had become an old joke in Wilmington that the "initials in MBNA, the credit-card lender once known as Maryland Bank, National Association, also stood for 'Mothers, Brothers, Nephews and Aunts.'" In fact, under founder Charles M. Cawley ("Cawley"), MBNA had a developed a "penchant" for hiring via friendship, blood and marriage – including Cawley's own relatives and in-laws. MBNA's recent proxy statement filed with the SEC on March 15, 2005 reveals the names and cash compensation of 15 employees who are related to senior managers whom Cawley hired. According to the Philadelphia Inquirer article:

Among others, MBNA employs:

Two brothers, three brothers-in-law and a sister-in-law of John R. Cochran, MBNA's chief operating officer. Cochran collected $18 million in cash, stock grants and options profit last year. His brothers, at $370,000 and $293,000, make more than any of his four MBNA-employee in-laws, whose pay ranged from $92,000 to $175,000.

Two brothers and a brother-in-law of vice chairman Lance L. Weaver. Weaver collected $11 million. His family members' pay ranged from $952,000 for Todd Weaver, head of MBNA's Western Regional Office, to a comparatively modest $63,428 for Drew Weaver.

Since Cawley retired from active management at the end of 2003, his own relatives on the MBNA payroll weren't listed, bank spokesman Jim Donahue said. However, Cawley himself is on the list: He's named as "father-in-law of Michael G. Rhodes," the current group executive for U.S. credit card business development.

Cawley, who made hundreds of millions of dollars from MBNA stock options during his long tenure, has remained senior adviser to the company. He collected $2.5 million in cash for his services in 2004. The company said he will retire from that position in August.

43.    The Company's Board of Directors lacked independence as well. In early 2004, the Board consisted of the following nine directors:

• James H. Berick, Esq.: Retired Partner, Squire, Sanders & Dempsey L.L.P. (successor to Berick, Pearlman & Mills Co., L.P.A., of which Mr. Berick was Chairman from July 1986 until January 2000), a law firm which received substantial compensation for legal services provided to the Company. Berick's son is a partner at Squire, Sanders & Dempsey. Berick has ties to the Lerner family going back decades. He was Al Lerner's college roommate and is godfather to Randolph Lerner, who became MBNA's Chairman after his father's death. A member of MBNA's Board since 1991, he was the Lerner family's lawyer and he still provides advice to the Lerner family. He is also a director of the Town and Country Trust, a real estate investment trust with longstanding ties to the Lerner family.

• Benjamin R. Civiletti, Esq.: Chairman, Venable LLP, a law firm which has received substantial compensation for legal services provided to the Company. One of Civiletti's sons, also a lawyer, is employed in MBNA's legal department.

• Bruce L. Hammonds: President and CEO of MBNA.

18

• William L. Jews.

• Randolph D. Lerner, Esq.: Owner of the Cleveland Browns football team. In 1999, the Board approved a 10-year marketing agreement with the Cleveland Browns football team, then owned by Al Lerner and now owned by Randolph D. Lerner, MBNA's Chairman.

• Stuart L. Markowitz, M.D.

• William B. Milstead: Retired Partner, Ernst & Young LLP, the Company's certified public accountant. Milstead served as the coordinating partner for MBNA at the time of its initial public offering in 1991.

• Norma Lerner: Widow of Company co-founder Al Lerner.

• Michael Rosenthal: Professor of English at New York's Columbia University, Al Lerner's alma mater.

James Berick was Chairman of MBNA's compensation committee, which decided on the pay for Lerner and co-founder Cawley. Cawley, who retired in December 2003, received total compensation of $45.5 million in 2003, putting him at the top of the U.S. list for CEO pay, according to a 2004 survey by Bloomberg News.

44.    MBNA came under intense pressure from shareholders in advance of the May 2004 annual meeting of shareholders who argued that the directors had become too cozy with the executives they were supposed to watch over. Preceding the Company's annual meeting of shareholders in May 2004, significant individual shareholders waged a campaign questioning the Board's independence. As a result, Norma Lerner and Michael Rosenthal were removed from the Company's Board.

45.    As a result of the lack of independence on the MBNA Board of Directors, MBNA's executives had become accustomed to receiving very heady compensation. In fact, the Company now admits it had previously followed what it describes as "a policy of providing high levels of compensation." Following the shareholder-led shakeup of the

MBNA Board in 2004, the Compensation Committee finally conceded to making significant reductions in executive compensation.

46.    By early 2005 the Compensation Committee had approved reductions of salaries, bonuses and equity awards which would result in a 34% reduction in total direct compensation for MBNA's CEO, defendant Hammonds, and a combined 37% reduction in total direct compensation for defendants Hammonds, Cochran, Struthers, Weaver and Vecchione, the Company's five most highly compensated executive officers.

47.    As a result of these cuts, at the beginning of the Class Period the Company's senior executives faced massive reductions in the level of compensation to which they had grown accustomed to receiving. At the same time, the Company's senior executives were sitting on tens of thousands of shares they had received in prior years as part of their compensation and unexercised stock options which will expire if not exercised by the expiration date. The strike price on these options was generally set at the price the stock was trading at on the day the options were granted, making them worthless if the stock price dropped below the strike price. Some of these stock options would have expired in 2005 if not exercised. Defendants knew the value of these options and shares would rapidly decline if they disclosed the true status of the Company's operations and business environment.

48.    Moreover, despite the attempt to better align MBNA's executive compensation with shareholder interests, the Company's executive compensation program for 2004 still utilized "short term corporate performance" as a primary metric in determining annual compensation to senior executives. As a result of defendants' concealment of the Company's true operating and financial status, for 2004 defendants

determined that the Company had "substantially achieved its net income goal and achieved its performance objectives for new accounts, managed credit losses and operating efficiency," but that it "did not achieve its goal for growth in managed loans or net interest margin."

49.    Nonetheless, the Compensation Committee determined that the Company's "overall results for 2004 were strong and the [Company] had a number of significant achievements in 2004 that the Committee and management believe position the [Company] well for the future." As a result, in January 2005 the Compensation Committee awarded a performance bonus to Hammonds equal to 90% of his 2004 salary (as reduced in August 2004) and awarded bonuses to Cochran, Weaver, Struthers and Vecchione equal to 80% of their 2004 salaries (as reduced in August 2004). Based on the Company's purportedly stellar performance, defendants bequeathed the Company's top five highest-paid executives alone over $200 million worth of performance bonuses and restricted stock awards (which vest 20% per year over five years and require no payment to exercise):

| Defendant | 2004 Bonus | Value of Restricted Shares Upon Grant | Total 2004 Incentive Compensation Award |
| --- | --- | --- | --- |
| Hammond | $1.083 M | $1.083 M | $2.17 M |
| Cochran | $943,000 | $943,000 | $1.89 M |
| Weaver | $1.962 M | $1.962 M | $3.92 M |
| Struthers | $1.962 M | $1.962 M | $3.92 M |
| Vecchione | $1.569 M | $1.569 M | $3.14 M |

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

50.     On October 16, 2003, defendants issued a press release entitled, "MBNA Reports Record Earnings for the Third Quarter." The press release stated in part:

> WILMINGTON, Del., Oct. 16 /PRNewswire-FirstCall/ -- MBNA Corporation (NYSE: KRB) announced today that net income for the third quarter of 2003 was $658.8 million or $.51 per common share, an increase of 70%, compared with $398.0 million or $.30 per common share for the third quarter of 2002. For the first nine months of this year, net income rose to $1.635 billion or $1.25 per common share, an increase of 34% compared with the first nine months of 2002. In September 2002, the Corporation implemented the industry wide FFIEC guidance for uncollectible accrued interest and fees for its loans. Excluding this change in 2002, earnings per common share would have been $.43, for the third quarter of 2002 and $1.06, for the first nine months of 2002. Earnings per common share for the third quarter of 2003 and for the first nine months of 2003 compared to the same period in 2002, excluding the change, would have increased 19% and 18%, respectively.
>
> *Loan receivables at September 30, 2003 were $28.8 billion, an increase of $2.5 billion over third quarter of 2002. Total managed loans at September 30, 2003 were $112.8 billion, an increase of $10.0 billion or 10% over the third quarter of 2002.*
>
> During the first nine months of 2003, the Corporation added 8.0 million new accounts, with 2.7 million new accounts added in the quarter. The characteristics of new cardholders are consistent with the quality of the Corporation's existing cardholders. In the United States, the typical new cardholder has more than a $70,000 annual household income, has been employed for more than 11 years, owns a home, and has a 18-year history of paying bills promptly. The company acquired 310 new endorsements from organizations and renewed more than 900 group contracts during the first nine months of 2003.
>
> Loan losses on loan receivables and managed loans for the third quarter of 2003 were 4.70% and 5.13%, respectively. In the month of September 2003, loan losses were 4.68% on loan receivables and 5.02% on managed loans. Loan losses continue to be lower than published industry levels. Delinquency on the loan receivables and managed loans was 3.75% and 4.48%, respectively, at September 30, 2003.

51.     The press release of October 16, 2003 was false and misleading for the following reasons. First, it presents an illusion of significant growth in loan receivables,

by comparing loan receivables at the end of 3Q03 with loan receivables at the end of

3Q02, to report a 9.4% increase, or $4.9 billion. However, this measure is not a quarter

to quarter comparison. It is instead a statement of the increase in loan receivables for the

12 month period ending on September 30, 2003. Had defendants compared loan

receivables versus the previous quarter ending on June 30, 2003, defendants would have

alarmed investors, by reporting *a decline of 3.4% or $1 billion in loan receivables versus*

*2Q03.* Thus, defendant's receivables comparison totally obscures meaningful and

important trends in the direction of growth of over time.

52.    As already stated, MBNA securitization note issuance during the second

half of 2003 had *dropped $1 billion or 20%, in comparison with the first half of 2003.*

(MBNA's SEC Form 10Q issued on November 14, 2003) Since MBNA securitization

note issuance is driven by loan receivables, this drop points to a significant contraction in

loan receivables during 3Q03. Nevertheless, defendants signaled to investors that the

business was growing rapidly, through the addition of 8 million new accounts, with 2.7

million added in 3Q03, as an alternative and misleading "positive" measure of

receivables growth. Thus, defendants' illusory presentation of significant growth for

3Q03 actually concealed a significant contraction in loan receivables, information that

investors needed to make prudent judgments about the progress and future prospects of

MBNA's business.

53.    On January 22, 2004, defendants issued a press release entitled, "MBNA

Reports Record Earnings for the Fourth Quarter." The press release stated in part:

> MBNA Corporation (NYSE: KRB) announced today that net income for
> the fourth quarter of 2003 was $703.5 million or $.54 per common share,
> an increase of 32%, compared with $540.2 million or $.41 per common
> share for the fourth quarter of 2002. For the full year, net income rose to

$2.34 billion or $1.79 per common share, compared with $1.77 billion or $1.34 per common share for 2002. Excluding the impact of the third quarter 2002 implementation of the industry-wide FFIEC guidance for uncollectible accrued interest and fees for the Corporation's loans, earnings per common share would have been $1.47 for the full year of 2002.

In addition, MBNA's Board of Directors has approved an increase of 20% in the quarterly dividend rate to $.12 per common share, which will increase the annual rate to $.48. MBNA has increased the dividend every year since it became a public company. The cash dividend is payable April 1, 2004 to stockholders of record as of March 15, 2004.

*Loan receivables at December 31, 2003 were $33.6 billion, an increase of $4.9 billion over the fourth quarter of 2002. Total managed loans at December 31, 2003 were $118.5 billion, an increase of $11.2 billion or 10.5% over the fourth quarter of 2002.*

During 2003, the Corporation added 10.7 million new accounts, with 2.7 million new accounts added in the quarter. The characteristics of new cardholders are consistent with the quality of the Corporation's existing cardholders. The company acquired 384 new endorsements from organizations in 2003, including Merrill Lynch, Arizona State University, Gander Mountain, National Geographic (U.K.), Banco Cooperativo (Spain), eBay, and Royal Caribbean International. The company also renewed more than 1,400 group contracts during 2003, including the NFL, University of Michigan, Cleveland Indians, American College of Surgeons, University of Arizona, The American Society of Mechanical Engineers, Texas A&M University, and WWF (U.K.).

Loan losses on loan receivables and managed loans for the fourth quarter of 2003 were 4.64% and 4.97%, respectively. For the full year, loan losses were 4.84% on loan receivables and 5.22% on managed loans. Loan losses continue to be lower than published industry levels. Delinquency on the loan receivables and managed loans was 3.84% and 4.39%, respectively, at December 31, 2003.

54.    The press release of January 22, 2004 was false and misleading for the following reasons. Defendants overstated the growth in loan receivables, by comparing loan receivables at the end of 4Q03 with loan receivables at the end of 4Q02, to report an increase of 17.0% or $4.9 billion. However, this deceptive measure is not a quarter to quarter comparison, but instead a statement of the increase in loan receivables for the 12

month period ending on December 31, 2003. Had defendants compared loan receivables versus the previous quarter ending September 30, 2003, defendants would have reported a larger increase, of 17.3% or $5.3 billion. More importantly, comparison of 4Q03 loan receivables with the prior quarter would also have signaled to investors a strong connection between the record 4Q03 profits and the atypical and unusually large nature of the increase in loan receivables during the quarter, as opposed to the false and misleading impression of a prolonged quarter over quarter growth trend. Thus, defendant's receivables comparison totally obscures meaningful and important trends in the direction of growth of over time.

55.    On April 16, 2004, defendants issued a press release entitled "MBNA Opens Representative Office in China - World's Largest Independent Credit Card Issuer Plans Entry in China". The press release stated in part:

> MBNA today announced the opening of a Representative Office in Shanghai, China.  MBNA will use the office to conduct market research, to further develop relationships with Chinese regulators and the banking community in China, and to design long-term strategies for entering China's credit card market.

> "We believe the opportunity to participate in building a strong credit card market in China is very promising," said Lance L. Weaver, Vice Chairman of MBNA Corporation.  "Personal income in China is growing rapidly and consumer confidence is high. There is a growing demand for credit services," Mr. Weaver added.

> Use of consumer credit products is relatively new in China, but in recent years consumer loans, including mortgages and auto loans, have increased to over $160 billion. This growth suggests that consumers in China are willing to borrow to pay for things that are important to them, and to repay loans over time.

> *"It is obvious that China's rapid development will be facilitated by banking institutions that are both innovative and responsible," Mr. Weaver said. "Access to credit will help increasingly affluent Chinese consumers achieve their dreams and will also help China expand its economy further."*

56.    Defendants' press release of April 16, 2004 provided investors with a false and misleading account of what the Chinese could expect from MBNA's entry into the consumer credit market in China. The suggestion that MBNA could facilitate China's rapid development was misleading, since MBNA concealed the fact that it was experiencing difficulties managing its US credit card operations, as evidenced by the $1 billion decline in securitizations during the second half of 2003. Foreign regulators were also now asking questions about MBNA credit card operations, with UK regulators pointing to concerns about "MBNA policies on default charges, the fees banks assess on late, overlimit or returned checks."

57.    On April 22, 2004, defendants issued a press release entitled, "MBNA Reports 21% Increase in Earnings Per Common Share; 2.5 Million New Accounts Added." The press release stated in part:

> MBNA Corporation announced today that net income for the first quarter of 2004 rose to $519.7 million or $.40 per common share, an increase of 21%, compared with $432.5 million or $.33 per common share for the first quarter of 2003.
>
> **Loan receivables at March 31, 2004 were $30.1 billion, an increase of $2.7 billion over the first quarter of 2003.  Total managed loans at March 31, 2004 were $117.6 billion, an increase of $11.5 billion or 11% over the first quarter of 2003.  Retail sales and cash advance volume increased 15% over the first quarter of 2003.**
>
> The Corporation added 2.5 million new accounts during the first quarter of 2004.  The characteristics of new cardholders are consistent with the quality of the Corporation's existing cardholders.  New endorsements acquired in the first quarter of 2004 include A.G. Edwards & Sons, The Timberland Company, National Fish and Wildlife Foundation, Reserve Officers Association of the U.S., American Nurses Association of California, Scarborough Building Society (U.K.), Rotary International (Spain), Viajes Marsans (Spain), Canadian Parks and Wilderness Society (CPAWS), and Universite de Laval (Canada).  The Corporation also renewed a number of group contracts during the first quarter of 2004, including American College of Physicians, Golf Digest, American Society

of Civil Engineers, St. Louis Cardinals, National Lawyers Association, Pennsylvania State Nurses Association, and Johns Hopkins Alumni Association.

Losses on loan receivables and managed loans for the first quarter of 2004 were 4.45% and 4.99%, respectively. Loan losses continue to be lower than published industry levels. Delinquency on the loan receivables and managed loans was 3.39% and 4.27%, respectively, at March 31, 2004.

\*\*\*

58.    The press release of April 22, 2004 was false and misleading for the following reasons. First, defendants again presented illusory growth in loan receivables, this time by comparing loan receivables at the end of 1Q04 with loan receivables at the end of 1Q03, to report a modest 9.5% increase, or $2.7 billion. However, this deceptive measure is not a quarter to quarter comparison, but instead a statement of the increase in loan receivables for the 12 month period ending on March 31, 2004. Had defendants compared loan receivables versus the previous quarter ending on December 31, 2003, *defendants would have shocked investors, by reporting that loan receivables plummeted 10.4% or $3.5 billion versus 4Q03*. Incredibly, defendant's receivables comparison totally obscures meaningful and important trends in the direction of growth of over time.

59.    As already stated, MBNA securitization note issuance during the second half of 2004 *dropped $3 billion or 60%, in comparison with the first half of 2003*. (MBNA's SEC Form 10Q issued on November 14, 2003.)  Since MBNA securitization note issuance is driven by prior growth in loan receivables, the drop in securitizations points to the significant contraction in loan receivables during 1Q04. Nevertheless, defendants signaled to investors that the business was growing rapidly, through the addition of 2.5 million new accounts during the quarter, as an alternative and misleading

measure of receivables growth. Thus, defendants' illusory presentation of significant growth for 1Q04 actually concealed a significant contraction in loan receivables, information that investors needed to make prudent judgments about the progress and future prospects of MBNA's business.

60.    On July 22, 2004, defendants reported results for the quarter ending June 30, 2004, in a press release entitled, "MBNA Reports 21% Increase in Earnings Per Common Share." The press release stated in part:

WILMINGTON, Del., Jul. 22 /PRNewswire-FirstCall/ -- MBNA Corporation (NYSE: KRB) announced today that net income for the second quarter of 2004 rose to $660.3 million or $.51 per common share, an increase of 21%, compared with $543.3 million or $.42 per common share for the second quarter of 2003.

> For the first six months of this year, net income rose to $1.180 billion or $.90 per common share, an increase of 20% compared to $975.9 million or $.75 per common share for the first six months of 2003.
>
> "We are pleased with our results so far this year, particularly in the areas of credit quality, fee income growth, and our continued investment in additional business development opportunities," said Bruce L. Hammonds, CEO of MBNA Corporation. "We completed the expansion of our operating platform for our international business this quarter; we are preparing for the anticipated launch of our American Express-branded credit card; and we are expanding our new business lines of professional practice financing and insurance premium financing."
>
> *Loan receivables at June 30, 2004 were $30.5 billion, an increase of $1.2 billion over the second quarter of 2003. Total managed loans at June 30, 2004 were $118.2 billion, an increase of $7.7 billion or 7.0% over the second quarter of 2003. In June, loan receivables increased $1.1 billion and total managed loans increased $1.2 billion. During the quarter, retail sales and cash advance volume increased 15% over the second quarter of 2003.*
>
> The Corporation added 2.5 million new accounts during the second quarter of 2004. The characteristics of new cardholders are consistent with the quality of the Corporation's existing cardholders. New endorsements acquired in the second quarter of 2004 include Massachusetts Institute of Technology, Southern Methodist University,

Churchill Downs, Arsenal Football Club (U.K.), Reader's Digest Canada, and Special Olympics Espana. The Corporation also renewed a number of group contracts during the second quarter of 2004, including National Society of Professional Engineers, Chicago Cubs, Florida Nurses Association, Air Force Academy, and Minnesota Dental Association.

Losses on loan receivables and managed loans for the second quarter of 2004 were 4.60% and 4.95%, respectively. Loan losses continue to be lower than published industry levels. Delinquency on loan receivables and managed loans was 3.48% and 4.08%, respectively, at June 30, 2004.

During the second quarter, the Corporation's financial statements were impacted by several items. Based on improving asset quality trends, the provision for possible credit losses was $94.0 million lower in the second quarter of 2004 than in the second quarter of 2003. The net impact of the change in the interest-only strip receivable reduced securitization income (which is part of other operating income) by $26.8 million for the second quarter of 2004 as compared to a $7.9 million increase for the second quarter of 2003. The Corporation's income tax expense for the second quarter of 2004 was reduced by $32.5 million as a result of the favorable resolution of federal and state examinations.

61.     The press release of July 22, 2004 was false and misleading for the following reasons. First, defendants again presented illusory growth in loan receivables, this time by comparing loan receivables at the end of 2Q04 with loan receivables at the end of 2Q03, to report a modest 4.1% increase, or $1.2 billion. However, this deceptive measure is not a quarter to quarter comparison, but instead a statement of the increase in loan receivables for the 12 month period ending on June 30, 2004. Had defendants compared loan receivables versus the previous quarter ending on March 31, 2004, defendants would have concerned investors, by reporting an astonishingly small increase of 0.1% or $300 million in loan receivables versus 1Q03. Thus, defendant's receivables comparison totally obscures meaningful and important trends in the direction of growth of over time.

62.     Issuance of MBNA securitization notes during the second half of 2004 dropped $3 billion, or 60%, in comparison with the first half of 2003. Since MBNA

securitization note issuance is driven by prior growth in loan receivables, the drop in securitizations points to the significant contraction in loan receivables during 2Q04. Nevertheless, defendants signaled to investors that the business was growing rapidly, through the addition of 2.5 million new accounts during the quarter, as an alternative and misleading measure of receivables growth. However, the adverse experience of MBNA credit card users, from a time prior to the beginning of the Class Period, coupled the continued flatness of loan receivables strongly infers that account retention was a growing problem for MBNA.

63.    Finally, defendants included in their discussion of results the fact that income derived from its IO strip receivable had dropped as much as $26.8 million during the second quarter of 2004. Given the way false and misleading way defendants continued to report quarterly positive growth in loan receivables, investors would be hard-pressed to see any connection between the true decline in receivables and the drop in IO strip receivable income. Thus, defendants' illusory presentation of significant growth for 2Q04 actually concealed a significant contraction in loan receivables, information that investors needed to make prudent judgments about the progress and future prospects of MBNA's business.

64.    On October 21, 2004, defendants issued a press release entitled, "MBNA Reports Record Third Quarter Earnings" The press release stated in part:

> WILMINGTON, Del., Oct. 21 /PRNewswire-FirstCall/ -- MBNA Corporation announced today that net income for the third quarter of 2004 rose to $728.3 million or $.56 per common share, an increase of 10%, compared with $658.8 million or $.51 per common share for the third quarter of 2003. For the first nine months of this year, net income rose to $1.908 billion or $1.46 per common share, an increase of 17% compared to $1.635 billion or $1.25 per common share for the first nine months of 2003.

"MBNA has implemented a wide range of strategic initiatives in 2004 further positioning ourselves for the future," said Bruce Hammonds, President and Chief Executive Officer of MBNA Corporation. "These initiatives include our preparations to issue MBNA American Express credit cards in the next few weeks, the acquisitions of several companies that open new lines of business for us, and the launch of terrific rewards programs with several key affinity partners."

*Loan receivables at September 30, 2004 were $32.1 billion, an increase of $3.3 billion or 11.5% over the third quarter of 2003. Total managed loans at September 30, 2004 were $117.8 billion, an increase of $5.1 billion or 4.5% over the third quarter of 2003.*

The Corporation added 2.3 million new accounts during the third quarter of 2004. The characteristics of new cardholders are consistent with the quality of the Corporation's existing cardholders. New endorsements acquired in the third quarter of 2004 include the Philadelphia Phillies, Starwood Hotels & Resort (Canada), Athabasca University (Canada), Ipswich Town Football Club (UK), Manchester City Football Club (UK), and Circulo de Lectores (Spain).

The Corporation also renewed a number of group contracts during the third quarter of 2004, including the National Trust for Historic Preservation, American College of Emergency Physicians, Santa Clara University, Virginia Nurses Association, American Association of University Professors, University of Liverpool (UK), and the Association of International Cancer Research (UK).

Losses on loan receivables and managed loans for the third quarter of 2004 were 4.28% and 4.61%, respectively. Loan losses continue to be lower than published industry levels. Delinquency on loan receivables and managed loans was 3.45% and 4.11%, respectively, at September 30, 2004. Based on improving asset quality trends, the provision for possible credit losses was $60.7 million lower in the third quarter of 2004 than in the third quarter of 2003.

65.    The press release of October 21, 2004 was false and misleading for the following reasons. First, defendants again presented yet another account of illusory growth in loan receivables, this time by comparing loan receivables at the end of 3Q04 with loan receivables at the end of 3Q03, to report an 11.5% increase, or $3.3 billion. Again, this deceptive measure is not a quarter to quarter comparison, but instead a statement of the increase in loan receivables for the 12 month period ending on

September 30, 2004. Had defendants compared loan receivables versus the previous quarter ending on June 30, 2004, defendants would have further perplexed investors, by reporting much smaller increase, of only 5.2% or $1.6 billion in loan receivables versus 3Q04. Thus, defendant's receivables comparison totally obscures meaningful and important trends in the direction of growth of over time.

66.     Issuance of MBNA securitization notes during the second half of 2004 dropped $3 billion or 60%, when compared with the first half of 2003. Since MBNA securitization note issuance is driven by prior growth in loan receivables, the drop in securitizations would point to the lower rate of increase in loan receivables during 3Q04. Nevertheless, defendants advised to investors that the business was still growing at a rapid pace, through the addition of 2.3 million new accounts during the quarter, as an alternative and misleading measure of "positive" receivables growth.

67.     However, this "new accounts" figure fails to take into account the increasingly adverse experiences of MBNA credit card users, dating back from a time prior to the beginning of the Class Period, coupled with the dramatic rise in "surfing", where customers open the account to access a zero percent rate, then pay it off before the rate changes. Thus, defendant's ongoing concealment of a flattening of loan receivables strongly implies that account retention was a growing internal problem for MBNA.

68.     On January 20, 2005, defendants issued a press release entitled "MBNA Reports Fourth Quarter Earnings of $.59 per Common Share - Increases Dividend 17% to $.56 Per Common Share - Announces New $2 billion Common Stock Repurchase Program." Promising to increase earnings by decreasing the churn associated with no-interest credit card offerings, in the press release and the earnings conference which

32

followed it the next morning, defendants announced that MBNA had then reduced no-interest introductory rate offerings to 10% of the 30 million to 40 million credit card promotions it mails out each month, down from 40% in January 2004. Defendants also reported a 9% rise in Q4 2004 net income (15% for the year), that charge-offs dropped 18 basis points to 4.43%, that the Q4 2004 delinquency rate declined to 4.13% of loans outstanding from 4.39% in Q4 2003, that loans grew 3% to $121.6 billion, that the Company was raising its dividend by over 17% and that its Board had approved a buyback of up to $2 billion in stock (or 6% of the outstanding shares), indicating defendants felt MBNA's stock was under-priced:

> MBNA Corporation announced today that net income for the fourth quarter of 2004 was $768.9 million or $.59 per common share, an increase of 9%, compared with $703.5 million or $.54 per common share for the fourth quarter of 2003. For the full year, net income rose to $2.68 billion or $2.05 per common share, an increase of 15% compared to $2.34 billion or $1.79 per common share for 2003.

> "We grew earnings 15% in a slower industry growth environment and were able to launch several new and exciting programs such as our partnership with American Express and the acquisition of new businesses," said Bruce L. Hammonds, Chief Executive Officer of MBNA Corporation. "We are pleased with the results achieved in 2004."

> In addition, MBNA's Board of Directors has approved an increase of 17% in the quarterly dividend rate to $.14 per common share, which will increase the annual rate to $.56 per common share. MBNA has increased the dividend every year since it became a public company. The cash dividend is payable April 1, 2005 to stockholders of record as of March 15, 2005.

> MBNA's Board of Directors has also approved a share repurchase program and authorized the repurchase of up to $2 billion of common stock over the next 2 years. Stock repurchases will be done selectively based on capital levels, asset growth levels, and share performance. The program reflects the corporation's commitment to return excess capital to stockholders while balancing the important objectives of asset growth and maintaining a strong balance sheet. This repurchase program will be in addition to the corporation's existing share repurchase program which

utilizes share repurchases to offset the impact of stock-based compensation programs.

MBNA announced that it will take a one-time restructuring charge in the first quarter of 2005. This restructuring charge is a result of the initiation of a voluntary early retirement program and a voluntary employee severance program. During the last several years, the corporation has taken steps to reduce its expenses through reduced hiring and other programs. Despite these efforts, MBNA remains staffed, particularly in management positions, at a level higher than anticipated business needs require. The company believes the voluntary early retirement and severance programs will assist the corporation in achieving staffing levels that meet expected future business needs and make MBNA more efficient.

The restructuring charge is expected to total approximately $300 million to $350 million pre-tax and result in anticipated pre-tax expense savings of approximately $150 million in 2005 and $200 million in 2006. Following the end of the voluntary early retirement and severance programs in March 2005, the corporation will undertake a review of its operations and look for opportunities to consolidate some of its facilities.

The corporation may incur additional expenses for the disposition of fixed assets related to this consolidation. "The restructuring we announced today was a difficult decision to make. We believe the programs we are offering to the people who work here are fair and provide those who elect to leave the company the ability to pursue other life goals," said Bruce L. Hammonds. "For our shareholders, this represents an important investment in our future. Combined with some important strategic initiatives started in 2004, we believe we are well positioned to achieve our long-term objectives." Some highlights for the year include:

• Hundreds of thousands of Customers activated their American Express-branded cards in the fourth quarter taking advantage of the valuable benefits of an American Express branded card backed by MBNA's top-notch Customer satisfaction.

• Throughout 2004, MBNA reduced its reliance on 0% promotional offers as a driver of receivables growth and introduced a number of value-based products centered upon the WorldPoints rewards platform. MBNA is driving innovative products through its powerful affinity partner distribution network and providing Customers with a wide array of choices, based on their individual needs and interests. Whether Customers choose an NFL Extra Points Visa, a PGA Tour Platinum MasterCard, or one of many professional or alumni programs, MBNA has a credit card to fit each Customer's individual needs and preferences.

• Internationally, MBNA's businesses in the United Kingdom, Canada,

and Spain continue to provide additional loan growth opportunities through the same affinity marketing strategy that drove the company's success over the last 20+ years. MBNA has more than 5,000 affinity partners in its U.S. and international businesses.

• MBNA continued to diversify in 2004 with the purchases of Premium Credit Limited (PCL), MBNA's premium financing company in the UK, and Sky Financial, MBNA's professional practice financing business in the U.S.

*Loan receivables at December 31, 2004 were $33.8 billion, an increase of $134.8 million over year-end 2003. Total managed loans at December 31, 2004 were $121.6 billion, an increase of $3.1 billion over year-end 2003.*

Losses on loan receivables and managed loans for the fourth quarter of 2004 were 3.74% and 4.43%, respectively. Loan losses continue to be lower than published industry levels. Delinquency on loan receivables and managed loans was 3.29% and 4.13%, respectively, at December 31, 2004.

***

69.     The press release of January 20, 2005 was false and misleading for the following reasons. Oddly enough, defendants were now faced with the need to compare loan receivables at the end of 4Q04 with loan receivables at the end of 4Q03, reporting a paltry 0.03% increase, or $134.8 million. Defendants were stuck with this deceptive measure, one that was not a quarter to quarter comparison, but instead a statement of the increase in loan receivables for a 12 month period, ending on December 30, 2004. Had defendants compared loan receivables versus the previous quarter ending on September 30, 2004, defendants would surprised investors with an encouraging increase of 5.3% or $1.7 billion in loan receivables versus 3Q04.

70.     Although the worst had past nearly two quarters ago and loan receivables achieved significant quarter over quarter increases in 3Q04 and 4Q04, the charade was not over. Precisely at this time, in connection with the materially false and misleading

35

disclosure of a paltry $134.8 million 4Q04 loan receivables increase, defendants announced their restructuring and share repurchasing programs. In effect, defendants had "queued up" belt tightening and stock support measures to play against a false and misleading picture of worsening business prospects.

71.     On January 21, 2005, Hammonds, Vecchione, Cochran and the entire executive committee held an earnings conference call during which MBNA gave earnings guidance for the first time in its history. Defendants explained that MBNA would offset any higher marketing spending with entirely voluntary 3% staff reductions. Managers and older employees would be offered incentives to take early retirement or leave the Company with a beefed-up severance package. According to defendants, the program would result in a Q1 2005 charge of $300 million to $350 million but was expected to save $150 million in 2004 and even more in 2006. Set to convince the market that unlike other credit card companies, MBNA would increase earnings by increasing its margins by lowering reliance on the less profitable no-interest card offerings, defendants gave what were essentially pro forma earnings results, backing out their existing no-percent loans:

> Now, we have been running off our zero rate loans, as most of you know, and we ran off from end of last year to the end of '04, $4 billion in zero rate loans. If you add that back in, our growth rate would have been 5 percent. The last numbers I saw for the industry through November was 2.5 percent, so we grew at about twice the industry, which is what we normally do.
>
> * * *
>
> The fact that we're running off zero loans means that we don't have to re price as many of our existing customers on the back end ....

72.     Defendants also explained that that the Company's delinquency and loss rates would decrease:

Losses were 4.43 percent for the quarter, down 18 basis points for the third quarter, and down 54 basis points year over year. And delinquency was 413, and our losses continue to come down, at 413, delinquency is a very, very good year end delinquency rates, and as we look out, it would seem to us that delinquency and losses should continue to decrease.

73.    Concerning growth the Company purported to then be experiencing, defendants said:

We expect earnings growth to average about 12 percent over the next several years. There will be years when it's more than 12, and years when it's less than 12. And in fact, in 2005, we expect it to be more like 10 percent. We expect it to [sic] the 10 percent this year primarily because we're starting the year off at a relatively low level of average growth. This, again, is a result of slow industry growth and our pullback on zero percent marketing.

As the year progresses, we expect asset growth to pick up. First, the impact of moving away from zero rates. We still have more outstandings to run down there, that's going to continue through the second half, and in the early part of the third quarter. At that point, when you look at us year over year, it will normalize. We also expect the industry growth rate to pick up in the second half of 2005.

* * *

Our 2005 EPS is $2.36, a 10% increase over 2004. We expect, in 2005, moderate loan growth, supported by strong retail growth and lower cash volume. We expect the risk-adjusted net interest margin to expand. Net interest margin will remain stable and we will see improving loan loss rates.

Operating income growth will be in line with loan growth. Higher interchange growth will result as a byproduct of stronger retail volume. And lower penalty and income lower penalty fee income will occur as the credit quality improves. The impact of our chronic over limit fee pricing in 2005 is nearly $140 million that we plan to grow through in '05.

Expenses will grow significantly slower than loan growth and we look for low single-digit growth. In addition, our expense growth includes the cost of stock option expensing in the second half of 2005. We will continue to see asset quality improvement. The effective tax rates should return back to historical levels and we will use enhanced capital management programs, if necessary, to support our $2.26 EPS goal.

In varied economic and competitive environments, MBNA has consistently grown year over year and has a long track record of producing exceptional financial results. As Bruce stated, in the last couple of years, we have demonstrated our ability to grow earnings at a rate faster than asset growth.

And we feel confident that we will continue to deliver consistent, profitable growth well into the future. Our core management team has been in place for over 20 years, the same team that has helped to deliver these exceptional results.

74.    Although defendants stated "as the year progresses, we expect asset growth to pick up", this belied the fact that asset growth, namely growth in loan receivables, *had already picked up during 4Q04, by a highly significant $1.7 billion.* In fact, looking back at true quarter-to-quarter comparisons during 2004, the Company had experienced a bottom in loan receivables in 1Q04, when they had *plummeted 10.4%, or $3.5 billion versus 4Q03.* Moving on to how the Company would increase earnings by decreasing its reliance on no-interest loans, defendants stated:

Growing profitable loans; let me just discuss with you our zero strategy. It's a place that we are happily diverging from our peers. We obviously were into zero in a big way a few years ago. About 12 to 18 months ago, we saw things happening in this area that we didn't like.

We saw surfing activity increasing, so we saw more and more customers open the account just for zero, and pay it off before the rate changed. The duration on zero moved out. When we started doing zero, we were doing it for a four-month duration. Today, you need to be added 15 months or maybe even life. And we still the marketing disappear.

As I said earlier, zero is bad, I think, for the entire industry, but I know it's bad for MBNA. It forces you to re price many of your other customers to pay for it. That's not the way to run a business, to take your long-term customers and re price those to bring in new customers at zero.

And just a personal opinion, I think it can make your marketing and advertising areas very lazy. If you can give things away, you sure don't have to be creative.

So we are moving away from zero and focusing on replacing these programs with rewards programs. It's better long-term profitability, and it's better for the customer. Now, this chart shows you why we do that. The line of the top is what happens when you put on a zero rate loan.

You can see the balance billed is much faster, early activation and high balance transfers, but over the long-term, full rate loans balances actually exceed zero, just about at the 9-month mark when we get ready to re price our zero-rate loan. So, it makes no sense for us to continue to do those zero-rate loans, with very few exceptions. The rewards programs give us opportunity to reinforce the affinity relationship. Zero certainly does not leverage affinity marketing.

Now again, like I said earlier, we decreased $4 billion in zero-rate loans in the U.S. This is what will happen next year. It will continue to come down, as I said earlier, through the second quarter and the early part of the third quarter and then it will normalize. We don't love the impact that that has on our top line, but it is absolutely the right thing to do.

75.    Following the earnings announcement, the New York Times reported that MBNA's reported earnings of $0.59 per share "topped the average estimate of 58 cents among analysts surveyed by Thomson Financial." MBNA's reported Q4 2004 19% profit increase was significant to the market because it came on the heels of Citigroup Inc., the nation's largest financial institution, reporting record profits for the Q4 2004 but guiding expectations down, saying that its own 2005 earnings could be at the low end of Wall Street expectations. Citigroup's CFO Sallie Krawcheck and its CEO, Charles Prince, told analysts higher interest rates and lower credit quality would require Citigroup to increase reserves. Shares in Citigroup dropped $0.27 to close at $47.77.

76.    MBNA's report also came a day after competitor Capital One Financial Corp. announced that its Q4 earnings had fallen 27% to $ 195 million. Capital One's per-share earnings, $0.77, were $0.22 short of Wall Street expectations. Capital One attributed its own shortfall to $511 million of expenses for marketing and advertising in the quarter. Capital One CEO and Chairman Richard Fairbank told investors that he

expected such spending to continue throughout 2005, and that similar outlays by the credit cards units of Citigroup Inc. and J.P. Morgan Chase & Co. made it necessary: "I think you are seeing, at least for the three of us, a sort of structural move toward the national-brand game. I don't really see anybody backing down." On this news, Capital One's stock fell by almost 8%, from approximately $83 per share prior to the announcement to below $77 per share in the days following the announcement.

77.     On January 25, 2005, analyst Matthew Park at A.G. Edwards increased his investment rating on MBNA's stock to "buy" from "hold," saying he came away from MBNA's January 21, 2005 earnings conference encouraged about MBNA's future profitability.

78.     Based upon defendants' promises that MBNA's delinquency and losses rates were improving and its extraordinary Q4 2004 results, and buffeted by the increase in MBNA's dividend, the increase in its stock buyback program, anticipated savings from the employee reduction program, and, most of all, the end of its own reliance on zero-interest credit card offerings and the positive net effect that would have on earnings and "Return on Managed Assets" ("ROMA"), MBNA's stock price closed up $0.24 to $27.44 on the NYSE on January 21, 2005.

79.     Having successfully managed both the concealment of the multi-billion dollar contraction in loan receivables during 2004 and a "soft landing" grounded in a lot of talk about a "zero strategy", certain of the Individual Defendants began rapidly selling almost $76 million worth of the Company's stock into the market:

| Date | Defendant | Shares Sold | Price | Gross Proceeds |
|---|---|---|---|---|
| 01/25/2005 | | | | |
| | Rhodes | 406,040 | $26.76 | $10,865,630 |
| | Weaver | 376,835 | $26.76 | $10,084,105 |
| | Krulak | 130,000 | $26.61 | $3,459,300 |
| | Scheflen | 125,810 | $26.85 | $3,377,999 |
| | Vecchione | 79,829 | $26.70 | $2,131,434 |
| | | 20,633 | $26.80 | $552,964 |
| 01/27/2005 | | | | |
| | Cochran | 398,150 | $26.51 | $10,554,957 |
| | | 133,009 | $26.55 | $3,531,389 |
| 01/27/2005 | | | | |
| | Hammonds | 351,409 | $26.51 | $9,315,853 |
| 01/31/2005 | | | | |
| | Krulak | 92,483 | $26.50 | $2,450,800 |
| 02/01/2005 | | | | |
| | Krulak | 224,754 | $26.75 | $6,012,170 |
| | | 50,217 | $27.00 | $1,355,859 |
| 02/03/2005 | | | | |
| | Struthers | 457,464 | $26.84 | $12,278,334 |
| Totals | | 2,846,633 | | $75,970,792 |

80.    On February 9, 2005, defendants appeared at a Credit Suisse First Boston ("CSFB") investor conference to discuss the Company's Q4 2004 results and future expectations. As they had during the January 21, 2005 earnings conference, defendants

displayed the following chart depicting the Company's history of "Consistent, Profitable

Growth" at the CSFB conference:



81.    During the conference, defendants admitted that the Company was seeing

"slowing growth" in its "core product," credit card interest revenues, but stated that

another trend the Company was then experiencing, growing "ROMA" or "Return on

Managed Assets," would counter the lack of growth and increase the Company's

revenues and earnings:



82.    Defendants stated an increase in ROMA would increase MBNA's earnings:



83.    Based on defendants' statements concerning the financial results and business environment they said MBNA was then experiencing, defendants once again stated MBNA would achieve 12% average annual EPS growth – with 10% in 2005 – and

a 20%+ increase on Return of Equity:

**Financial Results**
* 12% Average Annual EPS Growth, 10%* in 2005
* Return on Equity of 20%+

*10% EPS growth in 2005 excludes previously announced restructuring charge

84.    During the February 9, 2005 CSFB presentation, defendants once again attempted to increase investor confidence by repeating statements made concerning the "Rating Agency Perspective" during the January 21, 2005 earnings conference. Defendants again stated they had "met with and presented both the restructuring plan and stock repurchase program with rating agencies," stating that the rating agencies had "no major concerns." Defendants also stated that the rating agencies "Recognize[d] MBNA's proven ability to increase earnings through a variety of economic and competitive cycles."

85.    Then, on April 21, 2005, MBNA shocked the market, issuing a press release entitled "MBNA Reports Earnings Per Common Share of $.02, Including the Impact of the Previously Announced Restructuring Plan." The press release disclosed in relevant part that:

> [N]et income for the first quarter of 2005 was $31.7 million or $.02 per common share compared with $519.7 million or $.40 per common share for the first quarter of 2004 [and $0.59 per share in Q4 2004]. Net income in the first quarter of 2005 includes a restructuring charge of $767.6 million pre-tax [double the $300-$350 million stated on January 21, 2005]. Without the restructuring charge, net income was $514.1 million or $.40 per common share.
>
> In addition to the restructuring charge, the Corporation's results were further impacted by unexpectedly high payment volumes from U.S. credit card customers. The higher payments reduced managed loans in the quarter more than in prior years. Additionally, the payment volumes were particularly higher on accounts with higher interest rates, which adversely impacted the Corporation's yield on managed loans.

As a result of these recent trends, in the revaluation of its interest-only strip receivable, the Corporation projected lower excess spreads and higher payments. This reduced the interest-only strip receivable and resulted in a net loss from securitization activity of $206.6 million. The net loss from securitization activity is included in other operating income and caused the Corporation's first quarter 2005 other operating income to be lower than its first quarter 2004 other operating income.

The Corporation is implementing programs to offset the higher payment rates in the U.S. Card business. "It is a difficult environment right now. However, we've made progress on recent product introductions, diversification strategies, and improvements in credit quality and operating efficiency," said Bruce L. Hammonds, MBNA's Chief Executive Officer.

Based on the first quarter results and trends, management believes that MBNA's 2005 earnings per share will be significantly below its 10% growth objective.

*Loan receivables at March 31, 2005 were $31.8 billion, an increase of $1.8 billion over the first quarter of 2004 [but a decrease from the $33.8 billion at December 31, 2004]. Total managed loans at March 31, 2005 were $116.6 billion, a decrease of $1.0 billion compared to the first quarter of 2004 [but a decrease of $5 billion, down from $121.6 billion at December 31, 2004]. Total volume in the quarter rose to $49.3 billion, an increase of 5% over the first quarter of 2004. Total volume includes sales volume of $33.3 billion, which increased by 10% over the first quarter of 2004, and cash advance volume of $16.0 billion, which decreased by 5% from the first quarter of 2004.*

Losses on loan receivables and managed loans for the first quarter of 2005 were 3.98% and 4.48%, respectively [up from 3.74% and 4.43% respectively in the Q4 2004]. Delinquency on loan receivables and managed loans was 2.93% and 4.17%, respectively, at March 31, 2005 [with delinquency on managed loans up from 4.13% in the Q4 2004]. Based on improving asset quality trends, the provision for possible credit losses was $77.9 million lower in the first quarter of 2005 than in the first quarter of 2004.

The Corporation's other operating expense in the first quarter of 2005 was $2.1 billion, including the restructuring charge. The Corporation's focus on improved operating efficiency has generated better results than anticipated, and other operating expense, excluding the restructuring charge in the first quarter of 2005, was lower than in the first quarter of 2004 by 6%.

In addition, during the first quarter the Corporation repurchased approximately $250 million of common stock pursuant to its $2 billion share repurchase program announced in January 2005.

\* \* \*

As previously reported, MBNA Corporation has made significant progress on its plan to reduce its expense base. In connection with the restructuring plan, the Corporation will incur a charge of approximately $785 million pre-tax, $767.6 million pre-tax of which was recognized in the first quarter of 2005. The charge includes three major components -- staff reductions related to voluntary early retirement and voluntary severance programs, the disposition of fixed assets relating to facilities closings, and contract terminations. Approximately 85% of the charge will result in cash expenditures.

Approximately $500 million of the charge is related to the voluntary early retirement program and voluntary severance program announced in January 2005. The Corporation expects staff reductions from the programs to result in pre-tax expense savings of approximately $210 million in 2005 and approximately $225 million in 2006. This charge is higher than previously announced because more people than anticipated decided to take advantage of the programs' benefits. The success of this initiative will assist the Corporation in reducing its staff, particularly in management positions, to levels that meet expected future business needs and make MBNA more efficient.

Approximately $115 million of the charge is related to the disposition of fixed assets resulting from the Corporation's previously announced review of its operations. After this review, management decided to consolidate operations and close some facilities. The Corporation expects the disposition of fixed assets to result in pre-tax expense savings of approximately $15 million in 2005 and approximately $25 million in 2006.

In addition, the Corporation terminated a marketing agreement with a third party vendor that marketed the Corporation's products to endorsing organizations and terminated a limited number of other agreements. Management determined that the marketing agreement did not adequately support the Corporation's long-term objectives. Approximately $170 million of the charge is related to these contract terminations. The Corporation expects the contract terminations to result in pre-tax expense savings of approximately $25 million in 2005 and approximately $50 million in 2006.

86.    The true facts, which were known by each of the defendants but concealed from the investing public during the Class Period, were as follows:

(a) As early as the third quarter of 2003, securitization of credit card receivables was in decline and the decline remained an alarming component of defendants' structured financing activities throughout the Class Period;

(b) The quarterly comparisons defendants engineered to report loan receivable assets was deceptive, since they totally obscured meaningful and important trends in the direction of asset growth of over time;

(c) Loan receivables had contracted several times during the Class Period, with the most severe contraction occurring during the first quarter of 2004, when *loan receivables plummeted 10.4% or $3.5 billion versus 4Q03;*

(d) The addition of millions of new customer accounts in 2004 had not contributed to growth in loan receivables and stood in stark contrast with a contraction in loan receivables during a number of quarterly reporting periods;

(e) That the Company had experienced "unexpectedly high payment volumes from U.S. credit card customers", reducing managed loans and causing loan receivables to decrease by billions of dollars during the Class Period;

(f) Of the pre-pays, the higher interest rate borrowers were prepaying more than the lower interest rate borrowers, resulting in the prepays having a more adverse impact on the Company's yield on managed loans;

(g) MBNA had suffered several unseasonably sharp contractions in lending during the Class Period, including a contraction during Q1 2005, causing total managed loans to decrease $5 billion by the end of Q1 2004;

(h) The Company had been aggressively recognizing gains on sales of securitized no-interest loan receivables through off-balance sheet funding structures;

(i) MBNA was experiencing higher-than-expected delinquencies during the Q1 2005, increasing to 4.17% from 4.13% at the end of Q4 2004;

(j) The Company had completely reversed its margin-protection strategy of reducing reliance on no-interest loans and was instead increasing its offering of no-interest loans, which will significantly reduce future earnings;

(k) Losses on loan receivables and managed loans had increased to 3.98% and 4.48%, respectively, up from 3.74% and 4.43% respectively in the Q4 2004;

(l) Approximately 50% of MBNA's receivables were on a variable floating rate while approximately 80% of the Company's funding is tied to LIBOR, such that the Company's cost of funds was increasing more rapidly than the interest payments it was receiving from borrowers when interest rates increased;

(m) Due to the increase in pre-pays, the interest-only securitization strips valued on the Company's books at $1.3 billion were overstated by 16%, or $27 million ($0.10 per share); and

(n) The Company's previously announced Q1 2005 restructuring charge had doubled to $767.6 million ($0.38 per share) from the $300-$350 million announced on January 21, 2005.

87. Following the Company's shocking April 21, 2005 disclosures concerning the true state of its business operations, financial results and 2005 earnings expectations, the Company's stock price plummeted from its closing price of $23.11 on the close of

April 20, 2005, to below $19 per share on extremely high trading volume of 51 million shares, representing an astonishing 793% of its 52-week average daily trading volume.

88.    On April 28, 2005, Legg Mason issued an analyst report entitled "Consumer Finance – I/O Strip Issue Appears MBNA-Specific." In its report, Legg Mason stated that "In our view, the weakness at MBNA is more fundamentally-related and company-specific. With [Capital One] already reporting solid 1Q05 results (and no significant I/O strip writedown) and similarly-strong results expected for [Providian Financial Corp.], we doubt either is at risk." Legg Mason also reported that "we believe [Capital One] and [Providian] have taken more conservative approaches to gain on sale recognition in the past, limiting the potential for writedowns on weaker-than-expected trends in the future."

## LOSS CAUSATION/ECONOMIC LOSS

89.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated MBNA's stock price and operated as a fraud or deceit on Class Period purchasers of MBNA stock by misrepresenting the Company's business success and future business prospects.

90.    Defendants achieved this façade of success, growth and strong future business prospects by blatantly misrepresenting the Company's business prospects. Later, however, when defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, MBNA stock fell precipitously as the prior artificial inflation came out of MBNA's stock price. As a result of their purchases of MBNA stock during the Class Period, plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

91.    During the Class Period, the defendants presented a misleading picture of MBNA's business and prospects. Thus, instead of truthfully disclosing during the Class Period that MBNA's business was not as healthy as represented, defendants caused MBNA to falsely represent the strength of its growth in new loans, delinquency rates, loan loss rates, its ability to wean its sales model off teaser no-interest promotions, the value of its interest-only securitization strips and its forecasted earnings.

92.    These false claims of strong future results and the successful culmination of the Company's reliance on no-interest teaser promotional offers caused and maintained the artificial inflation in MBNA's stock price throughout the Class Period until the truth was revealed to the market.

93.    Defendants' false and misleading statements had the intended effect and caused MBNA stock to trade at artificially inflated levels throughout the Class Period, permitting insiders to sell almost $76 million worth of in their own MBNA stock and to justify the payment of millions of dollars in bonuses and other incentive compensation to themselves.

94.    On April 21, 2005, defendants were forced to publicly disclose that: (i) the Company was experiencing "unexpectedly high" prepayment volume during the Q1 2005; (ii) that during Q1 2005 more of the prepayments were the higher interest, higher revenue portion of its loan portfolio; (iii) that MBNA was suffering from an unseasonably sharp contraction in loans in Q1 2005; (iv) that MBNA was experiencing higher-than-expected delinquency rates during the Q1 2005; (v) that loan losses were increasing; (vi) that the Company had reversed it policy of not offering teaser no-interest promotional cards; (vii) that the value its interest-only securitization strips was overstated

by 16%; and (viii) that the Company's previously announced Q1 2005 restructuring charge had doubled during the quarter to $767.6 million. As investors and the market became aware that MBNA's actual business prospects were poorer than represented, which had been obfuscated by defendants, the prior artificial inflation came out of MBNA's stock price, damaging investors.

95.    As a direct result of defendants' admissions and the public revelations regarding the truth about MBNA's previous representations and its actual business prospects going forward, MBNA's stock price plummeted almost 20%, on unusually high volume, falling from $23.11 on April 20, 2005 to $18.50 per share on April 21, 2005, a one-day drop of $4.61 per share, on 793% of the average daily trading volume. This drop removed the inflation from MBNA's stock price, causing real economic loss to investors who had purchased the stock during the Class Period. In sum, as the truth about defendants' fraud and MBNA's business performance was revealed, the Company's stock price plummeted, the artificial inflation came out of the stock and plaintiff and other members of the Class were damaged, suffering economic losses of up to $4.61 per share.

96.    The almost 20% decline in MBNA's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of MBNA's stock price declines negate any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. During the same period in which MBNA's stock price fell almost 20% as a result of defendants' fraud

being revealed, the Standard & Poor's 500 securities index was flat. The economic loss, i.e., damages, suffered by plaintiff and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate MBNA's stock price and the subsequent significant decline in the value of MBNA's stock when defendants' prior misrepresentations and other fraudulent conduct was revealed.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5

### Against All Defendants

97.     Plaintiff incorporates ¶¶96 by reference.

98.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

99.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of MBNA publicly traded securities during the Class Period.

100.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for MBNA publicly traded

securities. Plaintiff and the Class would not have purchased MBNA publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

101.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of MBNA publicly traded securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act

### Against All Defendants

102.    Plaintiff incorporates ¶¶1-101 by reference.

103.    The Individual Defendants acted as controlling persons of MBNA within the meaning of §20(a) of the 1934 Act. By reason of their positions as officers and/or directors of MBNA, and their ownership of MBNA stock, the Individual Defendants had the power and authority to cause MBNA to engage in the wrongful conduct complained of herein. MBNA controlled each of the Individual Defendants and all of its employees. By reason of such conduct, the Individual Defendants and MBNA are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

104.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased MBNA publicly traded securities (the "Class") on the open market during the Class Period. Excluded from the Class are defendants.

105.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. MBNA had more than 1.27 billion shares of stock outstanding, owned by hundreds if not thousands of persons.

106.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether the 1934 Act was violated by defendants;

(b) Whether defendants omitted and/or misrepresented material facts;

(c) Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e) Whether the prices of MBNA's publicly traded securities were artificially inflated; and

(f) The extent of damage sustained by Class members and the appropriate measure of damages.

107.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

108.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

109.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to FRCP 23;

B. Awarding plaintiff and the members of the Class damages, interest and costs; and

C. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Jeffrey S. Goddess (Del. Bar No. 630)
Rosenthal, Monhait, Gross & Goddess, P.A.
Suite 1401, 919 Market Street
P. O. Box 1070
Wilmington, DE  19899-1070
(302) 656-4433

David R. Scott
Arthur L. Shingler, III
Scott & Scott LLC
Wells Fargo Building
401 B Street, Suite 307
San Diego, CA  92101
(619) 233-4565

Attorneys for Plaintiff

**PLAINTIFF CERTIFICATION**
**PURSUANT TO FEDERAL SECURITIES LAWS**

_Thomas J. Cussen_, ("Plaintiff"), declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the Complaint and retains Scott + Scott, LLC, and such co-counsel it deems appropriate to associate with, to pursue such action on a contingent fee basis.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel, or in order to participate in any action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transaction(s) in the MBNA Corp. ("KRB") security that is the subject of this action during the Class Period is/are as follows:

| No of Shares/Securities | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 200 Shares KRB | Buy | 12-2-04 | 27.06 |
| 100 Shares KRB | Buy | 15-12-04 | 27.02 |

5.    During the three years prior to the date of this Certification, Plaintiff has not served, or sought to serve as a class representative in a federal securities fraud case, except as follows:

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _2 6_ day of _May_, 2005, at _Tyler, TX_ (city, state).

Printed Name: _Thomas J Cussen_

Signature: _Thomas J Cussen_

Mailing Address:
(Please print)

Telephone #:

E-mail Address:                    **REDACTED**